ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| CDM Constructors, Inc. ) | ASBCA No. 61074 |
| ) | |
| Under Contract No. W912HN-15-C-0015 ) | |

APPEARANCES FOR THE APPELLANT: John T. Flynn, Esq.
Joseph J. Minock, Esq.
  Weinberg, Wheeler, Hudgins,
   Gunn & Dial, LLC
  Atlanta, GA

APPEARANCES FOR THE GOVERNMENT: Michael P. Goodman, Esq.
  Engineer Chief Trial Attorney
Laura J. Arnett, Esq.
  Engineer Trial Attorney
  U.S. Army Engineer District, Savannah

## OPINION BY ADMINISTRATIVE JUDGE O'SULLIVAN ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

CDM Constructors, Inc. (CDM) appeals a contracting officer's (CO's) final decision denying its claim for $3,157,098.58 in increased costs of performing a contract for the construction of dissolved oxygen injection systems at two locations on the Savannah River. CDM claims that the increased costs were the result of a suspension of work from August 14, 2015 to October 14, 2015, pursuant to a bid protest ultimately decided in the government's favor. The government moves for summary judgment on the grounds that (1) CDM cannot establish that the delay was unreasonable, which is a requirement for recovery under the Suspension of Work clause, and (2) in any event, CDM's claimed damages were not caused by the suspension. CDM opposes on the ground that there are genuine issues of law and fact regarding both the reasonableness of the suspension and the proximate cause of CDM's damages. We grant the motion for the reasons discussed below.

### STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

Contract No. W912HN-15-C-0015 (the contract) was awarded to CDM on July 31, 2015, by the U.S. Army Corps of Engineers, Savannah District (Corps). The contract, totaling $99,675,591, called for the construction of the Savannah Harbor

Expansion Project Dissolved Oxygen Injection System (DO project). (Gov't SMF ¶ 45)[1]

On August 14, 2015, the Corps notified CDM that a protest had been filed with the Government Accountability Office (GAO). The notice further advised CDM as follows:

> Please be advised that in accordance with 31 U.S.C. § 3553(d), 4 C.F.R. § 21.6, and FAR 33.104(c), performance of the contract is suspended, pending resolution of the protest. Do not begin performance until authorized to do so by the Contracting Officer.

(R4, tab 9 at 3) On October 8, 2015, the GAO denied the protest. On October 14, 2015, the Corps lifted the suspension, and on October 21, 2015, at the pre-construction meeting, the Corps issued the notice to proceed (NTP) (gov't SMF ¶¶ 69, 71, 74).

On December 21, 2015, CDM notified the Corps that the protest delay had caused its contemplated marine construction subcontractor, Cape Romain, to withdraw (R4, tab 17). As a result, CDM stated, it had resumed discussions with other marine contractors who offered both higher pricing and more extended schedules than Cape Romain had proposed (and on which CDM had based its proposal) (*id.*). The certified claim eventually submitted by CDM to the Corps on June 27, 2016, claimed increased costs in the amount of $3,157,098.58, allegedly caused by the protest suspension described above (R4, tab 18). CDM's claim was denied by the Corps on December 2, 2016, and CDM thereafter timely filed an appeal to the Board which was docketed on February 27, 2017.

The contract contained both the Federal Acquisition Regulation (FAR) 52.242-14, SUSPENSION OF WORK (APR 1984); and FAR 52.233-3, PROTEST AFTER AWARD (AUG 1996) clauses. The Suspension of Work clause provided, in relevant part:

> (a) The Contracting Officer may order the Contractor, in writing, to suspend, delay, or interrupt all or any part of the work of this contract for the period of time that the Contracting Officer determines appropriate for the convenience of the Government.
>
> (b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted

---

[1] All references herein to statements of material fact are to undisputed facts unless otherwise noted.

(1) by an act of the Contracting Officer in the administration of this contract, or (2) by the Contracting Officer's failure to act within the time specified by this contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly.

(R4, tab 8 at 148-49)

The Protest after Award clause provided, in relevant part:

(a) Upon receipt of a notice of protest (as defined in FAR 33.101) or a determination that a protest is likely (see FAR 33.102(d)), the Contracting Officer may, by written order to the Contractor, direct the Contractor to stop performance of the work called for by this contract. The order shall be specifically identified as a stop-work order issued under this clause. Upon receipt of the order, the Contractor shall immediately comply with its terms and take all reasonable steps to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage. Upon receipt of the final decision in the protest, the Contracting Officer shall either--

(1) Cancel the stop-work order; or

(2) Terminate the work covered by the order as provided in the Default, or the Termination for Convenience of the Government, clause of this contract,

(b) If a stop-work order issued under this clause is cancelled either before or after a final decision in the protest, the Contractor shall resume work. The Contracting Officer shall make an equitable adjustment in the delivery schedule or contract price, or both, and the contract shall be modified, in writing, accordingly, if--

(1) The stop-work order results in an increase in the time required for, or in the Contractor's cost properly allocable to, the performance of any part of this contract....

(R4, tab 8 at 137-38)

3

On October 6, 2014, CDM entered into a teaming agreement with Ballard Marine Construction for marine construction services on the DO project (gov't SMF ¶ 5). The teaming agreement set forth the parties' agreement to "exert their respective best efforts to produce and timely submit the jointly prepared Response to the RFP which is intended to cause the selection of CDM Smith[2] as the prime contractor and Ballard as an **exclusive marine construction sub-contractor** to perform the Project for the Owner" (*id.* ¶ 6).

CDM stated in its proposal that Ballard "will provide support of the in-water portion of the dissolved oxygen injection systems and associated ancillary work of the project" which could include, but was not limited to, "installing conveyance piping and associated items, installing Speece cones and diffusers, and conducting associated activities underwater (e.g. welding)" (R4, tab 4 at 585). Mr. Robert Gilbert, CDM's south regional operations manager, testified that this scope of work was only a portion of the entire marine construction scope of work on the DO project (app. resp., ex. 1 (Gilbert Deposition) at 12-13). Ballard was featured prominently in CDM's proposal for the DO project in both CDM's small business subcontracting plan, which noted that Ballard was both a small business and a woman-owned small business that would be performing "a significant portion of the effort," and CDM's past performance submission, which included a total of five projects, two of which were Ballard projects. CDM's proposal also included the teaming agreement between Ballard and CDM. (Gov't SMF ¶¶ 14, 16, 21)

CDM solicited proposals from several prospective subcontractors for the following scopes of work:

| | |
|---|---|
| 02-2600 | Marine Construction Subcontract |
| 02-4570 | Steel H Pile Subcontract |
| 02-4580 | Helical Piling Subcontract |
| 02-4750 | Steel Sheet Piling Subcontract |

(Gov't SMF ¶ 10) On February 20, 2015, Ballard submitted to CDM a proposal for all bid items under the marine construction subcontract (02-2600) and the helical piling subcontract (02-4580) (*id.* ¶ 11). After being informed that its prices were too high, Ballard resubmitted its proposal on February 22, 2015 (*id.* ¶ 12). However, CDM did not use Ballard's pricing for subcontract (02-2600) marine construction work in its final proposal revision submitted on May 27, 2015. Rather, it used pricing that it received from Cape Romain on or about May 18, 2015, plus some of its own estimates, for the entire scope of the marine construction work. (*Id.* ¶ 34) Mr. Gilbert testified that it was CDM's intention to go back to Ballard "and attempt to negotiate a

---

[2] Documents in the record tend to refer to CDM Smith and CDM Constructors interchangeably (*see, e.g.*, R4, tab 17, claim letter). The Board infers that CDM Constructors is a subsidiary of CDM Smith.

4

price that would be equal to the price that we submitted in our bid and then utilize them" (*id.* ¶ 98).

Prior to award of the DO project to CDM on July 31, 2015, Cape Romain submitted a bid in the amount of $38,500,000 for a South Carolina Ports Authority (SCPA) project to construct the Wando Welsh Terminal. On July 31, 2015, Cape Romain was the apparent low bidder on the SCPA project. (Gov't SMF ¶¶ 46-48) From February through July of 2015, Cape Romain had picked up approximately $53 million in ongoing work (*id.* ¶¶ 49-50). Due to the volume of ongoing work coupled with the award of the SCPA project, Cape Romain solicited no new work after July 31, 2015 (*id.* ¶ 103).

Following award of the DO project on July 31, 2015, CDM promptly contacted Ballard but did not contact Cape Romain, despite the fact that Cape Romain's proposal was good for only 90 days and expired on August 16, 2015. CDM admits that it did not contact Cape Romain prior to the protest suspension on August 14, 2015, and that it did not contact Cape Romain after the protest suspension to request that the proposal expiration date be extended. (App. resp. at 33) CDM states that it did not contact Cape Romain after the August 14th protest suspension because of the government's instruction to stop work on the contract (*id.*), but offers no explanation for its failure to contact Cape Romain prior to the protest suspension. The first contact between CDM and Cape Romain following award of the DO project was on August 28, 2015, when Cape Romain's president, Andrew DuPre, emailed CDM to congratulate them on the award and said, "I am assuming since I have not heard from you that you will not be utilizing Cape Romain." (Gov't SMF ¶ 64) CDM's lead estimator, Chad Barker, responded: "Job is under protest. We are in hold. Not able to say more than that now. We will be in touch." (App. resp., ex. 3)

Once the protest suspension was lifted on October 14, 2015, CDM still did not contact Cape Romain to offer it a subcontract for any portion of the contract scope of work. Cape Romain's president testified:

> Q: Did CDM ever contact you in October, November,
>    December 2015 and ask Cape Romain to perform
>    portions of the scope that they had proposed to attempt
>    to negotiate a smaller subcontract than the scope that
>    Cape Romain had bid?
> A: Not to my knowledge.

(Gov't SMF ¶ 110) Cape Romain informed CDM by email on October 20, 2015, that it would not be attending the pre-construction meeting on the DO project due to its workload, adding that "our availability stinks for awhile" (*id.* ¶ 72). When CDM nevertheless contacted Cape Romain via email on December 3, 2015, to ask it to review its pricing for any updates and to inform it that the start date for its subcontracted scope

5

of work would be approximately March/April of 2016, Cape Romain replied that it had previously informed CDM in October 2015 that its availability to work on the DO project was "terrible" and that it was fully booked with work until the fall of 2016 (app. resp., ex. 4). Thereafter, on December 18, 2015, CDM informed the government that Cape Romain had "pulled its bid" (gov't SMF ¶ 76).

On June 27, 2016, CDM submitted a certified claim seeking compensation in the amount of $3,157,098.58 for alleged increased costs as a result of the protest suspension (R4, tab 18). CDM asserted in its claim that "Cape Romain would not execute a subcontract with CDM" after the protest suspension was lifted because "it had been economically forced to pursue other opportunities rather than continue to remain idle during the indefinite suspension imposed by the Corps" (*id.* at 1027). As a result, CDM stated, it "was forced to reprocure the [Steel H Pile and Marine Construction] subcontract packages from two new subcontractors—Ballard [Marine Construction] and [The Industrial Company, Inc.] TIC" (*id.* at 1029). CDM's claim was denied by a CO's final decision dated December 2, 2016 (R4, tab 2). CDM timely filed a notice of appeal to the Board on February 24, 2017.

## DISCUSSION

Summary judgment will be granted if a moving party has shown that there are no genuine issues of material fact and it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A non-movant seeking to defeat summary judgment by suggesting conflicting facts must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). A genuine issue of material fact is one that is outcome determinative. *Liberty Lobby*, 477 U.S. at 247-48. If the non-moving party carries the burden of proof at trial for elements of its case and fails to provide such proof, the moving party is entitled to summary judgment. *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994). In deciding summary judgment motions we draw all reasonable inferences in favor of the non-movant; we do not resolve controversies, weigh evidence, or make credibility determinations. *Liberty Lobby*, 477 U.S. at 255.

Contentions of the Parties

The government advances two grounds in support of summary judgment. First, with respect to any liability it may have under the Suspension of Work clause, it asserts that CDM cannot prove that a suspension of approximately 60 days to resolve a GAO bid protest was anything but reasonable under the circumstances. However, it continues, should the Board be disinclined to rule summarily in the government's favor on the reasonableness of the suspension, the undisputed material facts

6

demonstrate that there was no causal nexus between the suspension and CDM's increased costs.

CDM, for its part, argues that the government is not entitled to a ruling that the suspension was reasonable "as a matter of law," and that CDM should not be foreclosed from an opportunity to show at trial that the suspension was unreasonable, under the particular circumstances of this case, as to at least part of the work (app. opp'n at 3). CDM further points to the Protest after Award clause, which specifically provides for a contractor to recover its increased costs caused by a protest suspension without any reference to whether the suspension was or was not reasonable (*id.* at 4 n.1). Finally, CDM asserts that material facts are in dispute with regard to the issue of causation, specifically, whether the suspension caused CDM to have to re-procure marine construction services from companies other than Cape Romain (*id.* at 7-14).

Reasonableness of the Suspension

We note that CDM has offered up no evidence from which we could infer that the suspension of work during the pendency of a GAO bid protest was unreasonable.[3] Since CDM bears the burden of proof on this issue at trial, its failure to proffer evidence of unreasonableness entitles the government to summary judgment on this issue. *Dairyland,* 16 F.3d at 1202. However, the Board must still consider CDM's claim under the Protest after Award clause, under which there is no requirement that the suspension be found unreasonable. The CO explicitly cited FAR Part 33 as the authority for the stop-work order (R4, tab 9). Under this clause, the issue that governs CDM's ability to recover on its claim is the issue of causation, to which we now turn.

Is there a Genuine Issue for Trial on Whether CDM's Increased Costs of Performance were Caused by the Protest Suspension?

With respect to causation, the government has offered up five reasons why, in its view, CDM cannot establish that the suspension of work caused it to lose Cape Romain as a subcontractor: (1) Cape Romain declined to enter into a subcontract with CDM because it was too busy with work it had picked up before the protest suspension; (2) CDM had a conditional proposal but no firm commitment from Cape Romain; (3) CDM's teaming agreement with Ballard Marine and its proposal to the Corps do not support its assertion that it intended to use Cape Romain for marine construction work; (4) CDM did not use pricing from Cape Romain for the H Pile work; and (5) CDM did

_____

[3] CDM argues that the suspension was unreasonable because it prevented CDM from finalizing subcontracts for millions of dollars worth of work, ultimately resulting in the withdrawal of Cape Romain (app. opp'n at 5-6). This is not evidence, only argument. Moreover, it begs the causation issue.

not attempt to subcontract work to Cape Romain after the contract was awarded (gov't mot. at 27). These five reasons overlap to a certain degree.

The parties disagree as to all five reasons proffered by the government and particularly as to: (1) whether CDM actually intended to use Cape Romain as a major subcontractor for the marine construction scope of work; and (2) whether Cape Romain could and would have performed both the work it had acquired before the protest suspension and its part of the DO project simultaneously. However, two material facts are undisputed: (1) Cape Romain stopped soliciting new work after July 31, 2015, due to the volume of work it had acquired up to and including that date; and (2) CDM did not try to contact Cape Romain after award of the DO project, either to enter into a subcontract, or to ask it to extend its proposal beyond the August 16, 2015 expiration date.

The question of whether Cape Romain would have had the capacity to simultaneously perform both its scope on the DO project and its other work, including the $38 million SCPA project, is the subject of various statements by Cape Romain's owner, Mr. DuPre, that CDM argues are in conflict. For instance, in a March 2017 affidavit, Mr. DuPre states that Cape Romain could and would have performed the DO project and the SCPA project simultaneously if CDM had offered Cape Romain a subcontract on or before August 24, 2015.[4] (Gov't SMF ¶ 101) However, Cape Romain provided to the government a later affidavit executed by Mr. DuPre in which he identified all of Cape Romain's pending work as of August 1, 2015, and stated that Cape Romain could not have accommodated the DO project if CDM had offered Cape Romain a subcontract in August of 2015. During his deposition on October 18, 2015, Mr. DuPre testified that if CDM had offered Cape Romain a subcontract "within the time frame of the proposal" (i.e., by August 16, 2015), Cape Romain would have "moved forward in some capacity...depending on the scope of what they [CDM] wanted." (Gov't SMF ¶¶ 102-05)

While we would draw all reasonable inferences from any irreconcilable conflicts in Mr. DuPre's testimony in favor of the non-moving party, CDM, we do not ultimately find the actual disputed facts to be material, i.e., outcome-determinative. Whether Cape Romain would have entered into a subcontract with CDM if CDM had offered one, either by August 16 or August 24, 2015, is pure speculation because CDM never offered Cape Romain a subcontract, either in August, September, October, or November 2015. Nor did CDM ask Cape Romain to extend its proposal expiration date, either before or after the protest suspension issued.[5]

---

[4] In its statement of undisputed material facts the government says the March 2017 affidavit was prepared by counsel for CDM. CDM does not dispute this.

[5] We do not find CDM's purported interpretation of the government's stop-work order as prohibiting it from securing its subcontractors to be reasonable. But, even if it

8

Similarly, one could construe Mr. DuPre's statement in the March 2017 affidavit that, by the time the stop work was lifted on October 14, 2015, Cape Romain had obtained enough other work that it was too busy to be able to move forward with the DO project (gov't SMF ¶ 101) to be in conflict with his deposition testimony that the protest did not affect Cape Romain's ability to perform the DO project (*id.* ¶ 111) and that Cape Romain stopped seeking new work after July 31, 2015, when it was the apparent low bidder on the SCPA project (*id.* ¶ 103). However, the two statements are not clearly in opposition, and in light of the undisputed fact that Cape Romain stopped soliciting new work after July 31, 2015, it seems clear that the August 14, 2015, protest suspension did not cause Cape Romain to have too much work to take on the DO project—because it already had too much work to do so.

Finally, we view the dispute with respect to whether CDM actually intended to use Cape Romain as its marine construction subcontractor as non-material. Certainly, CDM witnesses have testified that they intended to use Ballard Marine for at least part of the marine construction work (that is, if they were able to negotiate Ballard Marine down to Cape Romain's prices). But the issue of CDM's intent does not directly affect the issue of causation that is before us, and therefore is not outcome-determinative.

At trial, CDM would have the burden of proof to show that the protest suspension was the proximate cause of Cape Romain's unavailability. Thus, it was incumbent on CDM to provide its proof of causation to the Board in opposition to the government's motion for summary judgment. *Dairyland*, 16 F.3d at 1202.

On the record presented to us, we do not see how the proximate causes of Cape Romain's unavailability to perform marine construction work on the DO project can be anything other than a combination of the volume of work Cape Romain had or would acquire by July 31, 2015, and CDM's failure to secure Cape Romain as a subcontractor, or at least an extension of Cape Romain's proposal, in a timely manner. CDM exerted no effort in Cape Romain's direction before the suspension or during the suspension. Even after the suspension was lifted and despite a number of signals coming from Cape Romain indicating its likely unavailability due to its workload, CDM displayed no sense of urgency with respect to Cape Romain.

CDM's manifest failure to act to secure Cape Romain is not in dispute, and in combination with the amount of work on Cape Romain's plate by July 31, 2015, is the primary, if not the sole, cause of Cape Romain's ultimate unavailability to perform work

---

were, it does not explain CDM's conceded failure to act to secure Cape Romain's services or at least an extension of its proposal following award of the DO project and before the suspension issued.

on the DO project. This forecloses the possibility that CDM could prove at trial that Cape Romain's unavailability was caused by the protest suspension.

## CONCLUSION

The government's motion for summary judgment is granted. The appeal is denied.

Dated: August 20, 2018

LYNDA T. O'SULLIVAN
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61074, Appeal of CDM Constructors, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

10